**EXHIBIT 1**

Yongmoon Kim (NJ Atty. ID #026122011)
KIM LAW FIRM LLC
411 Hackensack Avenue, Suite 701
Hackensack, New Jersey 07601
Telephone & Fax (201) 273-7117
ykim@kimlf.com

Ronald I. LeVine (NJ Atty. ID #278801972)
ron@ronlevinelaw.com
Eileen L. Linarducci (NJ Atty. ID #030891983)
elinarducci@ronlevinelaw.com
LAW OFFICE OF RONALD I. LEVINE, ESQ.
210 River Street, Suite 11
Hackensack, New Jersey 07601
Tel. (201) 489-7900
Fax (201) 489-1395

*Attorneys for Plaintiff David M. Liebman*

| | |
|---|---|
| DAVID M. LIEBMAN, *on behalf of himself and those similarly situated,*<br><br>Plaintiff,<br><br>vs.<br><br>MRS BPO, L.L.C.; SECOND ROUND SUB LLC; and JOHN DOES 1 to 10,<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY<br>LAW DIVISION: ESSEX COUNTY<br><br>Civil Action<br><br>Docket No. ESX-L-4578-21<br><br>**SUMMONS** |

From The State of New Jersey To The Defendant(s) Named Above:

The plaintiff, named above, have filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the Superior Court in the county listed above within 35 days from the date you received this summons, not counting the date you received it. (A directory of the addresses of each deputy clerk of the Superior Court is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/prose/10153_deptyclerklawref.pdf.) If the complaint is one in

foreclosure, then you must file your written answer or motion and proof of service with the Clerk of the Superior Court, Hughes Justice Complex, P.O. Box 971, Trenton, NJ 08625-0971. A filing fee payable to the Treasurer, State of New Jersey and a completed Case Information Statement (available from the deputy clerk of the Superior Court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiffs' attorneys whose names and addresses appear above, or to plaintiffs, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee of $175.00 and completed Case Information Statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within 35 days, the court may enter a judgment against you for the relief plaintiffs demands, plus interest and costs of suit. If judgment is entered against you, the Sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services office in the county where you live or the Legal Services of New Jersey Statewide Hotline at 1-888-LSNJ-LAW (1-888-576-5529). If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A directory with contact information for local Legal Services Offices and Lawyer Referral Services is available in the Civil Division Management Office in the county listed above and online at http://www.judiciary.state.nj.us/prose/10153_deptyclerklawref.pdf.

Dated: June 15, 2021

*/s/ Michelle M. Smith*
Michelle M. Smith
Clerk of the Superior Court of New Jersey

Name of Defendant to be served:          **MRS BPO, L.L.C.**

Address of Defendant to be served:       **c/o Jeffrey M. Freedman**
                                         **1930 Olney Avenue**
                                         **Cherry Hill, New Jersey 08003**

Page **2** of **2**

Yongmoon Kim (NJ Atty. ID #026122011)
KIM LAW FIRM LLC
411 Hackensack Avenue, Suite 701
Hackensack, New Jersey 07601
Telephone & Fax (201) 273-7117
ykim@kimlf.com

Ronald I. LeVine (NJ Atty. ID #278801972)
ron@ronlevinelaw.com
Eileen L. Linarducci (NJ Atty. ID #030891983)
elinarducci@ronlevinelaw.com
LAW OFFICE OF RONALD I. LEVINE, ESQ.
210 River Street, Suite 11
Hackensack, New Jersey 07601
Tel. (201) 489-7900
Fax (201) 489-1395

*Attorneys for Plaintiff David M. Liebman*

| | |
|---|---|
| DAVID M. LIEBMAN, *on behalf of himself and those similarly situated,*<br><br>Plaintiff,<br><br>vs.<br><br>MRS BPO, L.L.C.; SECOND ROUND SUB LLC; and JOHN DOES 1 to 10,<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION: ESSEX COUNTY<br><br>Civil Action<br><br>Docket No.<br><br>**CLASS ACTION COMPLAINT and JURY DEMAND** |

Plaintiff David M. Liebman, individually and on behalf of those similarly situated, by

way of Class Action Complaint against Defendants MRS BPO, L.L.C., Second Round Sub LLC,

and John Does 1 to 10, state:

## NATURE OF THE CASE

1.      This is a putative class action arising from Defendants, MRS BPO, L.L.C. and

Second Round Sub LLC's unlawful disclosure of private financial information to third parties

without the prior consent of the consumers.

2.      The Fair Debt Collection Practices Act prohibits the disclosure of information to

third parties to prevent identity theft and invasions of privacy. As the National Consumer Law

Center put it eloquently:

> As the world has gone digital, consumers' records, both financial and otherwise,
> are increasingly vulnerable to exposure. Transactions that were once fleeting,
> recorded only on paper and filed in some cabinet, or perhaps reduced to
> microfiche, are now but mouse-clicks away from duplication and dissemination.

> Unregulated databases, escalating numbers of mergers, and the proliferation of
> information brokers—private investigators who specialize in obtaining
> computerized records—all threaten privacy. As was noted in Congress,
> "databases of personal identifiable information are increasingly prime targets of
> hackers, identity thieves, rogue employees, and other criminals, including
> organized and sophisticated criminal operations."

> The internet raises particular privacy concerns, as information sent over the World
> Wide Web may pass through dozens of different computer systems, each of which
> can snatch and hold the information in its coffers. In addition, website owners can
> track consumers' online behavior and gather information about their preferences,
> often without their knowledge. Web bugs, or tiny graphics that are put into web
> pages and e-mails, can monitor who views the information. Clickstream data can
> tell website owners which pages of the site were viewed and for how long.
> "Cookies" dropped onto a computer may not identify the user by name but do
> identify the particular computer, which allows an interested party to assemble a
> great deal of information about that computer's user.

> Financial information is especially sensitive, able to reveal not just a consumer's
> standard of living and debt load, but also personal preferences and lifestyle details
> ranging from books bought to prescriptions purchased. In *California Bankers
> Ass'n v. Shultz*, Justice Powell pointed out that "[f]inancial transactions can reveal
> much about a person's activities, associations, and beliefs." Justice Douglas
> elaborated further:

> A checking account . . . [m]ay well record a citizen's activities, opinion, and
> beliefs as fully as transcripts of his telephone conversations . . . In a sense a
> person is defined by the checks he writes. By examining them the agents get to
> know his doctors, lawyers, creditors, political allies, social connections, religious
> affiliation, educational interests, the papers and magazines he reads, and so on ad
> infinitum.

> The same can be said of credit card charges, debit purchases, and online

transactions. Forty years later, the details of these revealing consumer activities are easily collected, compiled, analyzed, and accessed, and thus have created a lucrative market for their trade. One industry leader among data aggregation companies, Acxiom, advertises that it has data on 2.5 billion consumers. Acxiom claims that one of its products covering American consumers has data on 250 million consumers, offering data not just on individual demographics, but also household characteristics, financial information, life events, major purchases, and behavior, all of which allows for targeted marketing. Experian reports that it manages data on more than 300 million consumers and 126 million households, while Equifax claims a database of over 115 million U.S. households distributed over 150 different segment groups, which can be used to predict behavior. In 2017, Equifax suffered a data breach that involved the personal data on nearly half the United States population being stolen, a breach that a Congressional committee found to have been "entirely preventable." In 2014, the Federal Trade Commission filed a complaint against another data broker that allegedly bought the payday loan applications of consumers and then sold the information to marketers with no legitimate need for it, leading some scammers among them to debit millions from the consumers' Account.

National Consumer Law Center, Fair Credit Reporting (9th ed. 2017) § 18.1, *updated at*

www.nclc.org/library (footnotes omitted and alterations in original) (attached as *Exhibit A*).

3.    For example, in enacting the FDCPA, Congress found "abundant evidence of the

use of abusive, deceptive, and unfair debt collection practices by many debt collectors. Abusive

debt collection practices contribute to the number of personal bankruptcies, to marital instability,

to the loss of jobs, and **to invasions of individual privacy**. 15 U.S.C. § 1692(a). *See also*

*Douglass v. Convergent Outsourcing*, 765 F.3d 299, 303-04 (3d Cir. 2014) ("The disclosure of

[the consumer's] account number raises these privacy concerns. The account number is a core

piece of information pertaining to [the consumer's] status as a debtor and Convergent's debt

collection effort. Disclosed to the public, it could be used to expose her financial predicament.

Because Convergent's disclosure implicates core privacy concerns, it cannot be deemed

benign.").

4.    Despite the *Douglass* ruling, Defendants continue to misuse and unlawfully

disclose private financial information about consumers to third-parties.

5.      Defendants' disclosure of sensitive financial information to third parties is an act consistent with a course of conduct and practice which was either designed to, or had as its natural consequence, an attempt to obtain money from consumers through the use of false, misleading, deceptive, abusive, unfair, unconscionable, and unlawful conduct prohibited by common law and statutory law including, but not limited to, the Consumer Fraud Act ("CFA"), N.J.S.A. 56:8-1, *et seq.*, and the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692, *et seq.*

6.      Defendants are subject to strict liability under the FDCPA for the prohibited communication with third parties "without the prior consent of the consumer given directly to the debt collector . . . in connection with the collection of [the] debt, with any person other than the consumer . . . ." 15 U.S.C. § 1692c(b) and for violating 15 U.S.C. § 1692d(3).

7.      Thus, Plaintiff bring this class action for damages against Defendants arising from Defendants' unlawful disclosure of sensitive and confidential personal identifying and financial information, when attempting to collect debts from New Jersey consumers.

8.      Defendants are subject to strict liability under the FDCPA for communicating with third parties "without the prior consent of the consumer given directly to the debt collector . . . in connection with the collection of [the] debt, with any person other than the consumer . . . ."

### JURISDICTION AND VENUE

9.      This Court has jurisdiction to entertain this matter pursuant to 15 U.S.C. § 1692k(d) and 28 U.S.C. § 1331.

10.     Venue is proper in Essex County because Defendants regularly conduct business there, including the collection of debts against New Jersey residents residing in Essex County.

### PARTIES

11.     Plaintiff, David M. Liebman ("Liebman"), is a natural person.

12.     "Plaintiff" refers to Liebman.

13.     At all times relevant to this lawsuit, Plaintiff was a citizen of the State of New Jersey.

14.     Defendant, MRS BPO, L.L.C. ("MRS") is a collection agency with an office located at 1930 Olney Avenue, Cherry Hill, New Jersey 08003.

15.     Defendant, Second Round Sub LLC ("SRS") is a collection agency with an office located at 1701 Directors Boulevard, Suite 900, Austin, Texas 78744.

16.     Defendants John Does 1 to 10 are natural persons and/or business entities all of whom reside or are located within the United States and personally created, instituted and, with knowledge that such practices were contrary to law, acted consistent with and oversaw policies and procedures used by the employees of Defendants that are the subject of this Complaint. Those defendants personally control the illegal acts, policies, and practices utilized by Defendants and, therefore, are personally liable for all of the wrongdoing alleged in this Complaint. Those fictitious names of individuals and businesses alleged for the purpose of substituting names of defendants whose identity will be disclosed in discovery and should be made parties to this action.

17.     Some or all of John Does 1-10 set the policies and practices complained of herein.

18.     Some or all of John Does 1-10 were actively engaged in the practices complained of herein.

19.     In this pleading, "Defendants" in the plural refers to all Defendants.

### FACTUAL ALLEGATIONS

A.     **Allegations Regarding Defendants' Practices Generally**

20.     Defendants regularly collect or attempt to collect debts that are past due.

21.     Defendants regularly collect or attempt to collect debts allegedly owed to others

which were incurred primarily for personal, family or household purposes.

22.     Defendants are in the business of collecting debts or alleged debts of natural persons which arise from transactions which are primarily for personal, family, or household purposes.

23.     The alleged receivables associated with the debts were assigned to Defendants for the purpose of collection.

24.     Defendants use the mails, telephone, the internet and other instruments of interstate commerce in engaging in the business of collecting defaulted debts or alleged debts of natural persons which arise from transactions which are primarily for personal, family, or household purposes.

25.     Defendants are collection agencies.

**B.      Plaintiff Liebman**

26.     Defendants have asserted that Liebman allegedly incurred or owed certain financial obligations arising out of a personal account.

27.     The debt ("Debt') arose from one or more transactions which were primarily for Liebman's personal, family or household purposes.

28.     This account ("Account") was assigned to Defendants for collection.

29.     Defendants contend that the Account is past due and in default.

30.     The Account was past due and in default at the time it was placed with or assigned to Defendants for collection.

31.     In an attempt to collect the Debt, MRS mailed a collection letter to Liebman on June 11, 2020 ("6/11/20 Letter") to collect.

32.     A true copy of the 6/11/20 Letter but with redactions, is attached as *Exhibit B*.

33.     Liebman received and reviewed the 6/11/20 Letter.

34.     Upon information and belief, the 6/11/20 Letter was mailed using a third-party letter vendor.

35.     Liebman never provided consent to Defendants to communicate to third parties regarding his Debt.

36.     By using a letter vendor, Defendants have recklessly disclosed Liebman's personal identifying information and private information about his Debt to a third party without Liebman's prior consent.

37.     Defendants unlawfully disclosed information about Liebman's Debt including the account number associated with the Debt and the alleged balances due.

38.     The FDCPA prohibits a debt collector from communicating with third parties "without the prior consent of the consumer given directly to the debt collector . . . in connection with the collection of any debt, with any person other than the consumer, his attorney, a consumer reporting agency if otherwise permitted by law, the creditor, the attorney of the creditor, or the attorney of the debt collector ."[1]

39.     The FDCPA also prohibits "[t]he publication of a list of consumers who allegedly refuse to pay debts . . . ."[2]

40.     Unlawfully communicating with a third party letter vendor regarding Plaintiff's debt violates the FDCPA because it is impermissible communication under sections 1692c(b) and 1692d(3) which has the potential to cause harm to a consumer.[3]

---

[1] 15 U.S.C. § 1692c(b).
[2] 15 U.S.C. § 1692d(3).
[3] *See Hunstein v. Preferred Collection & Mgmt. Servs.*, 994 F.3d 1341 (11th Cir. 2021) (communicating with third party letter vendor violated the FDCPA).

41.     MRS used the same procedures it used in sending the 6/11/20 Letter to Plaintiff when sending the same and/or similar letters to numerous other New Jersey consumers.

42.     During the proposed class period, MRS sent letters the same or similar to the 6/11/20 Letter to numerous New Jersey consumers in an attempt to collect a debt.

43.     It is Defendants' policy and practice to unlawfully communicate and convey private and sensitive information about consumers with third parties by using third party vendors to send written collection communications in attempts to collect consumer debts.

44.     Upon information and belief, Defendants published a list of debtors, including Plaintiff, that allegedly refuse to pay debts.

CLASS ACTION ALLEGATIONS

45.     Plaintiff brings this action individually and as a class action on behalf of all others similarly situated pursuant to Rule 4:32 of the New Jersey Rules of Court.

46.     Subject to discovery and further investigation which may require Plaintiff to modify the following class definition at the time Plaintiff moves for class certification, Plaintiff seeks certification of a class initially defined as follows:

> **Class**: All natural persons residing in the State of New Jersey whose information was disclosed by MRS BPO, L.L.C., to a third party on or after June 10, 2015, in an attempt to collect a debt on behalf of Second Round Sub, LLC.
>
>> **FDCPA Subclass**: All natural persons residing in the State of New Jersey, to whom MRS BPO, L.L.C., sent a collection letter; which letter (a) was dated within one year prior to June 10, 2021; (b) was seeking to collect a consumer debt allegedly owed to Second Round Sub, LLC; and (c) was sent using a third party letter vendor.

47.     Plaintiff seeks to recover statutory damages, actual damages, and attorney's fees and costs on behalf of himself and all class members under the claims asserted herein.

48.     The Class for whose benefit this action is brought is so numerous that joinder of

all members is impracticable.

49.     There are questions of law and fact common to the members of the Class that predominate over questions affecting only individuals.

50.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. A class action will cause an orderly and expeditious administration of the claims of the Class and will foster economies of time, effort and expense by avoiding thousands of individual suits that will be based on the same legal theories that can be resolved in a single proceeding.

51.     Plaintiff's claim is typical of the claims of the members of the Class. They are a member of the Class.

52.     The questions of law and/or fact common to the members of the Class predominate over any questions affecting only individual members.

53.     Plaintiff does not have interests antagonistic to those of the Class.

54.     The Class, of which Plaintiff is a member, are readily identifiable. The Defendants have records of each account.

55.     Plaintiff will fairly and adequately protect the interests of the Class, and have retained competent counsel experienced in the prosecution of consumer litigation. Proposed Class Counsel have investigated and identified potential claims in the action; have a great deal of experience in handling class actions, other complex litigation, and claims of the type asserted in this action.

56.     The prosecution of separate actions by individual members of the Class would run the risk of inconsistent or varying adjudications, which would establish incompatible standards of conduct for the Defendants in this action or the prosecution of separate actions by individual

members of the class would create the risk that adjudications with respect to individual members of the class would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests. Prosecution as a class action will eliminate the possibility of repetitious litigation.

57.     Plaintiff does not anticipate any difficulty in the management of this litigation.

### FIRST COUNT
### DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF FOR THE CLASS

58.     Plaintiff repeats and realleges all prior allegations as if set forth at length herein.

59.     Defendants' prohibited disclosure of private and sensitive information constitute unfair and unconscionable commercial practices and otherwise violate the Consumer Fraud Act ("CFA") at N.J.S.A. 56:8-2 and the FDCPA at 15 U.S.C. § 1692 *et seq.*

60.     Plaintiff suffered ascertainable loss from Defendants' CFA violations.

61.     Plaintiff therefore has standing to seek injunctive and other equitable relief under the CFA, at N.J.S.A. 56:8-19, and the FDCPA.

62.     Moreover, under the Uniform Declaratory Judgments Law at N.J.S.A. 2A:16-53, the Plaintiff and the putative Class members can seek declaratory relief.

63.     The Defendants and their agents or others acting on their behalf should be enjoined from any further action or failing to take actions that result in any invasion of privacy, retain benefits from its illegal acts by the use of protected private and financial information.

**WHEREFORE**, as to Count One, Plaintiff, on behalf of himself and the putative class members, hereby requests a Judgment against Defendants, jointly and severally,

a.  Granting class certification for class-wide equitable relief under R. 4:32-1(b)(2), and issuing a declaratory judgment applicable to the Plaintiff and putative Class and Subclass, pursuant to the Uniform Declaratory Judgments Law at N.J.S.A. 2A:16-53,

ruling that:

    1.  Defendants violated the CFA.

    2.  Defendants violated the FDCPA.

b.  Granting a permanent injunction against the Defendants, pursuant to the CFA, at N.J.S.A. 56:8-19, and the FDCPA prohibiting them from the disclosure of consumer's information;

c.  Directing the Defendants to provide equitable notice relief pursuant to the CFA and FDCPA, providing for notice to Class members of the declaratory and injunctive ruling.

d.  Awarding Plaintiff's counsel reasonable attorneys' fees and costs under the CFA;

e.  For such other and further relief as the Court deems equitable and just.

### SECOND COUNT
### DAMAGES UNDER THE CONSUMER FRAUD ACT ON BEHALF OF THE CLASS

64.     Plaintiff repeats and realleges all prior allegations as if set forth at length herein.

65.     Defendants are "persons" within the meaning of the CFA at N.J.S.A. 56:8-1.

66.     Plaintiff and those similarly situated obtained "merchandise" within the meaning of the CFA at N.J.S.A. 56:8-1.

67.     Defendants engaged in unconscionable commercial practices, deception, fraud, false promises, false pretenses and/or misrepresentations in connection with the sale of merchandise in violation of the CFA at N.J.S.A. 56:8-2.

68.     Defendants engaged in unconscionable commercial practices, deception, fraud, false promises, false pretenses and/or misrepresentations in the subsequent performance of the sale of merchandise in violation of the CFA at N.J.S.A. 56:8-2.

69.     Defendants committed unconscionable commercial practices, deception, fraud, false promises, false pretenses and/or misrepresentations in direct violation of the CFA at

N.J.S.A. 56:8-2.

70.     As a result of Defendants' unlawful actions, Plaintiff and the Class members suffered ascertainable loss from Defendants' CFA violations, entitling them to treble damages under the CFA, at N.J.S.A. 56:8-19.

**WHEREFORE**, as to Count Two, Plaintiff, on behalf of himself and the putative Class members, hereby requests a Judgment against Defendants,

a.   Granting class certification of the Subclass under R. 4:32-1(b)(3);

b.   Awarding treble damages under the CFA, at N.J.S.A. 56:8-19;

c.   Alternatively awarding a refund of all moneys collected under the CFA, at N.J.S.A. 56:8-2.11;

d.   Awarding Plaintiff's counsel reasonable attorneys' fees and costs under the CFA, at N.J.S.A. 56:8-19;

e.   For pre-judgment and post-judgment interest; and

f.   For such other and further relief as the Court deems equitable and just.

### THIRD COUNT
### NEGLIGENCE ON BEHALF OF THE CLASS

71.     Plaintiff repeats and realleges all prior allegations as if set forth at length herein.

72.     Defendants owed the Plaintiff a duty to maintain the confidentiality of his private and financial information.

73.     Expert testimony is not required to establish that the disclosure of confidential and protected information breaches a commonly known duty owed by Defendants.

74.     The disclosure of the confidential and protected information of the Plaintiff and the Class damaged them by exposing their private information to persons who lacked any right or entitlement to know their private information.

75.     The Plaintiff and others have suffered a compensable loss arising from the disclosure of their protected private and financial information.

76.     The Class has likewise suffered a compensable loss arising from the disclosure of their protected private and financial information.

**WHEREFORE**, as to Count Three, Plaintiff, on behalf of himself and the putative Class members, hereby requests a Judgment against Defendants,

a.  Granting class certification of the Class under R. 4:32-1(b)(3);

b.  A money judgment for compensatory damages based on the Defendants' disclosure of the Plaintiff and Class' private information;

c.  For attorney's fees, litigation expenses and costs in connection with this action;

d.  For pre-judgment and post-judgment interest; and

e.  For such other and further relief as the Court deems equitable and just.

## FOURTH COUNT
### INVASION OF PRIVACY ON BEHALF OF THE CLASS

77.     Plaintiff repeats and realleges all prior allegations as if set forth at length herein.

78.     Defendants invaded the privacy of Plaintiff by unreasonable publication of private facts.

79.     These private facts, Plaintiff's financial information, are actually private matters, the dissemination of such facts would be offensive to a reasonable person and there is no legitimate interest of the public in being apprised of the facts publicized.

80.     Expert testimony is not required to establish that the disclosure of confidential financial information invaded a person's privacy.

81.     By publishing the private financial information of the Plaintiff and the Class, Defendants damaged them by exposing their private information to persons who lacked any right

or entitlement to know their private financial information.

82.    The Plaintiff and others have suffered a compensable loss arising from the invasion of their privacy.

83.    The Class has likewise suffered a compensable loss arising from the invasion of their privacy.

**WHEREFORE,** as to Count Four, Plaintiff, on behalf of himself and the putative Class members, hereby requests a Judgment against Defendants,

a.    Granting class certification of the Class under R. 4:32-1(b)(3);

b.    A money judgment for compensatory damages based on the Defendants' invasion of the privacy of the Plaintiff and Class;

c.    For attorney's fees, litigation expenses and costs in connection with this action;

d.    For pre-judgment and post-judgment interest; and

e.    For such other and further relief as the Court deems equitable and just.

### COUNT FIVE
### FAIR DEBT COLLECTION PRACTICES ACT FOR THE FDCPA SUBCLASS

84.    Plaintiff repeats and realleges all prior allegations as if set forth at length herein.

85.    Defendants are "debt collectors" within the meaning of 15 U.S.C. § 1692a(6).

86.    The Debt is a "debt" within the meaning of 15 U.S.C. §1692a(5).

87.    Plaintiff is a "consumer" within the meaning of 15 U.S.C. § 1692a(3).

88.    The 6/11/20 Letter is a "communication" as defined by 15 U.S.C. § 1692a(2).

89.    Defendants sent the 6/11/20 Letter in an attempt to collect a "debt" within the meaning of 15 U.S.C. §1692a(5).

90.    Defendants violated the FDCPA including sections 1692c, 1692c(b), 1692d, 1692d(3), and 1692f of the FDCPA.

91.     Based on any one of those violations, Defendants are liable to Plaintiff and the Class for statutory damages, attorney's fees and costs under 15 U.S.C. § 1692k.

**WHEREFORE**, as to Count Five, Plaintiff, on behalf of himself and the putative Class members, hereby requests a Judgment against Defendants, MRS BPO, L.L.C. and Second Round Sub LLC,

a.  An order certifying that the Cause of Action may be maintained as a class pursuant to R. 4:32 including defining the class, defining the class claims, and appointing Plaintiff as the class representative and the undersigned attorney as class counsel;

b.  An award of statutory damages for Plaintiff pursuant to 15 U.S.C. § 1692k(a)(2)(A) and § 1692k(a)(2)(B)(i);

c.  An award of statutory damages for the Class pursuant to 15 U.S.C. § 1692k(a)(2)(B)(ii);

d.  Attorney's fees, litigation expenses, and costs pursuant to 15 U.S.C. § 1692k(a)(B)(3); and

e.  For pre-judgment and post-judgment interest; and

f.  For such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues subject to trial by jury.

## DESIGNATION OF TRIAL COUNSEL

Pursuant to Rule 4:25-4, Yongmoon Kim is designated as trial counsel for Plaintiff.

## CERTIFICATION

Pursuant to Rule 4:5-1, I hereby certify to the best of my knowledge that the matter in controversy is not the subject of any action pending in any court or the subject of a pending arbitration proceeding, nor is any other action or arbitration proceeding contemplated. There is a

similar case styled *Scibilia v. MRS BPO, L.L.C.*, ESX-L-3614-21. I further certify that I know of no party who should be joined in this action at this time.

I hereby certify that pursuant to Rule 1:38-7: All confidential identifiers of the parties to this action have been redacted from all documents or pleadings submitted to the Court.

Dated: June 10, 2021                        KIM LAW FIRM LLC

                                            */s/ Yongmoon Kim*
                                            Yongmoon Kim, Esq.

                                            *Attorneys for Plaintiff*

NCLC
DIGITAL
LIBRARY
Published on NCLC Digital Library (https://library.nclc.org)
Date downloaded: April 26, 2021 6:52 pm

The Fair Credit Reporting Act (FCRA) protects a limited segment of financial privacy, by regulating consumer reporting agencies (CRAs) that collect credit information about consumers, those who provide information to the CRAs, and those who seek information from CRAs. However, many consumer financial transactions do not fall within the FCRA, and other sources of privacy law must be examined to see if they can protect personal financial data from those who seek to acquire and exploit it. Discussed below are some federal statutes, state statutes, common law tort claims, and identity theft laws that may serve to shield consumers' economic conduct.

As the world has gone digital, consumers' records, both financial and otherwise, are increasingly vulnerable to exposure. Transactions that were once fleeting, recorded only on paper and filed in some cabinet, or perhaps reduced to microfiche, are now but mouse-clicks away from duplication and dissemination.

Unregulated databases, escalating numbers of mergers, and the proliferation of information brokers—private investigators who specialize in obtaining computerized records—all threaten privacy. As was noted in Congress, "databases of personal identifiable information are increasingly prime targets of hackers, identity thieves, rogue employees, and other criminals, including organized and sophisticated criminal operations."[1]

The internet raises particular privacy concerns, as information sent over the World Wide Web may pass through dozens of different computer systems, each of which can snatch and hold the information in its coffers. In addition, website owners can track consumers' online behavior and gather information about their preferences, often without their knowledge. Web bugs, or tiny graphics that are put into web pages and e-mails, can monitor who views the information. Clickstream data can tell website owners which pages of the site were viewed and for how long. "Cookies" dropped onto a computer may not identify the user by name but do identify the particular computer, which allows an interested party to assemble a great deal of information about that computer's user.[2]

Financial information is especially sensitive, able to reveal not just a consumer's standard of living and debt load, but also personal preferences and lifestyle details ranging from books bought to prescriptions purchased. In *California Bankers Ass'n v. Shultz*,[3] Justice Powell pointed out that "[f]inancial transactions can reveal much about a person's activities, associations, and beliefs." Justice Douglas elaborated further:

> A checking account . . . [m]ay well record a citizen's activities, opinion, and beliefs as fully as transcripts of his telephone conversations . . . In a sense a person is defined by the checks he writes. By examining them the agents get to know his doctors, lawyers, creditors, political allies, social connections, religious affiliation, educational interests, the papers and magazines he reads, and so on ad infinitum.[4]

The same can be said of credit card charges, debit purchases, and online transactions. Forty years later, the details of these revealing consumer activities are easily collected, compiled, analyzed, and accessed, and thus have created a lucrative market for their trade. One industry leader among data aggregation companies, Acxiom, advertises that it has data on 2.5 billion consumers.[5] Acxiom claims that one of its products covering American consumers has data on 250 million consumers, offering data not just on individual demographics, but also household characteristics, financial information, life events, major purchases, and behavior, all of which allows for targeted marketing.[6] Experian reports that it manages data on more than 300 million consumers and 126 million households,[7] while Equifax claims a database of over 115 million U.S. households distributed over 150 different segment groups, which can be used to predict behavior.[8] In 2017, Equifax suffered a data breach that involved the personal data on nearly half the United States population being stolen, a breach that a Congressional committee found to have been "entirely preventable."[9] In 2014, the Federal Trade Commission filed a complaint against another data broker that allegedly bought the payday loan applications of consumers and then sold the information to marketers with no legitimate need for it, leading some scammers among them to debit millions from the consumers' accounts.[10]

Marketers are intensely interested in consumers' online and other behavior so they can pinpoint consumers for advertising.[11] Businesses want to learn as much about consumers as possible.[12] Furthermore, since the 9/11 attacks, the federal government, specifically the National Security Agency, has voraciously sought data about individuals both inside and outside the United States.[13] Political groups seek out and aggregate information about consumers to assign them "persuasion scores" that purport to measure how likely that consumer is to vote for or against a particular candidate.[14] Even the mundane task of grocery shopping is considered sufficiently informative that supermarkets use "loyalty cards" to track every item purchased by every cardholder, and they are free to sell that information to anyone who might be interested. There is a near insatiable hunger to

© Copyright, National Consumer Law Center, Inc., All rights reserved. Terms of Use.
National Consumer Law Center and NCLC are trademarks of National Consumer Law Center, Inc.

EXHIBIT A

NCLC
DIGITAL
LIBRARY   Published on NCLC Digital Library (https://library.nclc.org)
Date downloaded: April 26, 2021 6:52 pm

learn how consumers get and spend their money.

Notwithstanding the sensitivity embedded in a person's financial choices, they are, for the most part, fair game for trade. While federal law protects against disclosure of video rental preferences,[15] cable viewing preferences,[16] medical records,[17] and student records,[18] it does not yet prevent financial or other institutions from selling their customers' Social Security numbers, account balances, maturity dates, securities holdings, or other information to private entities.[19] Consequently, consumers remain largely ignorant of the trafficking in such personal information.

In 2014, the FTC conducted an in-depth study of nine data brokers that collect personal information about consumers and then sell it for marketing and other purposes, and issued an extensive and often critical report.[20] In addition to describing the processes by which data brokers gather and use consumer information, the agency called for Congress to "consider enacting legislation that would enable consumers to learn of the existence and activities of data brokers and provide consumers with reasonable access to information about them held by these entities."[21] In effect, this is a call for Congress to extend some of the basic rights provided by the FCRA to data that falls outside that act. However, there could be downsides to such legislation to regulate data brokers, such as preemption of stronger state laws and potential impairment of the FCRA if brokers are covered under both that Act and the proposed law.

Though the FCRA limits some disclosures by private parties of consumer financial information, it does not give consumers the right to prohibit a CRA from disclosing accurate, nonobsolete information to those deemed to have a permissible purpose.[22] Furthermore, while some data warehouses fall within the definition of a CRA,[23] others that sell their records for reasons other than those included in the definition of a CRA may evade the FCRA's restrictions.[24]

In addition, the Gramm-Leach-Bliley Act (the GLBA) gives consumers a limited right to "opt out" of certain disclosures by financial institutions to nonaffiliated third parties.[25] However, its abundant exceptions arguably all but destroy the protection it purports to provide.

American privacy law is poorly suited to protecting privacy, especially of computerized consumer information. Aside from the FCRA, privacy laws largely fall into three categories: laws protecting personal privacy from invasions by governments, federal or local; the common law tort of invasion of privacy; and statutes and case law that prohibit private parties from obtaining[26] or disclosing[27] specific types of information. Relevant provisions of the GLBA[28] will be described in this last category;[29] they impose certain notice requirements on financial institutions who disclose financial data and a limited right for consumers to opt out of some kinds of disclosures.

## Footnotes

1 {1} Personal Data Privacy and Security Act of 2005, S. 1332, 109th Cong. (June 29, 2005).

2 {2} *See* www.epic.org/privacy/internet/cookies [1].

3 {3} 416 U.S. 21 (1974).

4 {4} *Id*. at 85, 90 (Douglas, J., dissenting).

5 Acxiom Data: Unparalleled Global Consumer Insights [2] 2, *available at* https://www.acxiom.com.

6 Acxiom Data: Unparalleled Global Consumer Insights [2] 3–4, *available at* https://www.acxiom.com.

7 {7} Experian, Experian Marketing Services: Consumer View [3], *available at* https://www.experian.com.

© Copyright, National Consumer Law Center, Inc., All rights reserved. Terms of Use.
National Consumer Law Center and NCLC are trademarks of National Consumer Law Center, Inc.   Page 2 of 5

[EXHIBIT A]

Published on NCLC Digital Library (https://library.nclc.org)
Date downloaded: April 26, 2021 6:52 pm

8 {8} Equifax, Compiled Data [4], *available at* www.equifax.com. In 2017, Equifax had credit information on 820 million consumers. U.S. House of Representatives, Committee on Oversight and Government Reform Majority Staff Report, The Equifax Data Breach [5] 15 (Dec. 2018), *available at* https://republicans-oversight.house.gov.

9 U.S. House of Representatives, Committee on Oversight and Government Reform Majority Staff Report, The Equifax Data Breach [5] 2 (Dec. 2018), *available at* https://republicans-oversight.house.gov.

10 {10} Fed. Trade Comm'n, FTC Charges Data Broker with Facilitating the Theft of Millions of Dollars from Consumers' Accounts (Dec. 23, 2014) [6], *available at* www.ftc.gov.

11 {11} *See* Frank Pasquale, *The Dark Market for Personal Data*, N.Y. Times, Oct. 16, 2014.

12 {12} *See, e.g.*, Stephanie Clifford and Quentin Hardy, *Attention, Shoppers: Store Is Tracking Your Cell*, N.Y. Times, July 14, 2013; Your Privacy for Sale, Consumer Rep. (Oct. 2006).

13 {13} *See* James Risen and Laura Poitras, N.S.A. Gathers Data on Social Connections of U.S. Citizens, N.Y. Times, Sept. 28, 2013 [7], *available at* www.nytimes.com (describing the practices of NSA in analyzing phone call and e-mail logs, along with material from "public, commercial and other sources, including bank codes, insurance information, Facebook profiles, passenger manifests, voter registration rolls and GPS location information," for both foreigners and Americans alike).

14 {14} For instance, in the 2016 election the data analytics company Cambridge Analytica claimed to have developed "psychographic" profiles on potential voters that the Trump campaign could exploit to grow its voter base. *See* Nicholas Confessore and Danny Hakim, *Data Firm Says "Secret Sauce" Aided Trump; Many Scoff*, N.Y. Times, Mar. 6, 2017, at A1. *See also* Jim Rutenberg, *Data You Can Believe In: The Obama Campaign's Digital Masterminds Cash In*, N.Y. Times Magazine, June 20, 2013. One data-mining company that specializes in voter information, Aristotle, Inc., advertises that it maintains a "massive and ever-expanding database [that] includes over 190 million U.S. voters" and that it can "microtarget[]" individuals based on their "interests and hobbies," along with "political district, political party affiliation, super-voters, gender, ethnicity, marital status, wealth, educational level and presence of children." http://aristotle.com/political-data [8].

15 {15} Video Privacy Protection Act of 1988, 18 U.S.C. § 2710.

Several states have similar acts, some of which extend beyond prohibiting merely the disclosure of video rental records to the disclosure of the purchase or rental of *any* written materials. *See, e.g.*, Mich. Comp. Laws § 445.1712 (known as both Michigan's Preservation of Privacy Act and the Video Rental Privacy Act) (prohibiting, with exceptions anyone who is "engaged in the business of selling at retail . . . written materials" from disclosing information about the transaction in a way that "indicates the identity of the customer"). *See also* Coulter-Owens v. Rodale, Inc., 2015 WL 575004, at *4 (E.D. Mich. Feb. 11, 2015) (denying dismissal of claim under state video rental privacy act arising from the alleged sale by the defendant, a magazine publisher, of subscribers' information to data-mining companies). The Sixth Circuit recently limited the reach of Michigan's act by concluding that a magazine publisher that used independent third parties to sell subscriptions could not be liable to a customer who had bought a subscription to its publication because the publisher was therefore not "in the business of selling at retail." Coulter-Owens v. Time Inc., 695 Fed. Appx. 117, 123–124 (6th Cir. 2017).

16 {16} Cable Communications Policy Act of 1984, 47 U.S.C. § 551(c). Note that the USA PATRIOT Act expanded the list of disclosures permitted by the Cable Communications Policy Act by adding certain disclosures made to specified government authorities. Pub. L. No. 107-56, § 211 (Oct. 26, 2001), *amending* 47 U.S.C. § 551(c).

[EXHIBIT A]

© Copyright, National Consumer Law Center, Inc., All Rights Reserved. Terms of Use.
National Consumer Law Center and NCLC are trademarks of National Consumer Law Center, Inc.

NCLC 181 Introduction
DIGITAL
LIBRARY
Published on NCLC Digital Library (https://library.nclc.org)
Date downloaded: April 26, 2021 6:52 pm

17 {17} Most health insurers and providers must comply with the Privacy Rule promulgated pursuant to the Health Insurance Portability and Accountability Act (HIPAA). 45 C.F.R. §§ 160.101 to 160.312, §§ 164.102 to 164.534. The HIPAA Privacy Rule generally prohibits covered entities from using or disclosing protected health information except as specifically allowed. Among the permitted disclosures are those to CRAs for purposes of payment, so long as the disclosure is limited to the following information: name and address, date of birth, Social Security number, payment history, account number, and name and address of the health care provider. 45 C.F.R. §§ 164.501, 164.506(c)(1). In 2009, Congress expanded the categories of those subject to HIPAA's anti-disclosure requirements in the Health Information Technology for Economic and Clinical Health Act (the HITECH Act). Pub. L. No. 111-5, 123 Stat. 115 (Feb. 7, 2009) (codified in scattered sections of titles 26 and 42 of the United States Code). *See also* 45 C.F.R. § 160.103 (containing an expanded definition of the "business associates" who are subject to the anti-disclosure provisions). For a discussion of the HIPAA Privacy Rule, see National Consumer Law Center, Collection Actions § 9.3.4 [9] (4th ed. 2017), *updated at* www.nclc.org/library. See § 5.4 [10], *supra*, for a discussion of the FCRA's restrictions on medical information.

18 {18} Family Educational Rights & Privacy Act of 1974, 20 U.S.C. § 1232g.

19 {19} Federal law prohibits firms and persons who regularly prepare income tax returns for others from disclosing personal tax information or using it for other purposes, with a few exceptions. 26 U.S.C. § 7216. The Privacy Act of 1974, 5 U.S.C. § 552a, requires all government agencies, whether federal, state, or local, that request Social Security numbers to provide a disclosure statement that explains whether the consumer is required to provide the number, how it will be used, and under what statutory authority the agency is requesting the number. The Act provides that a consumer cannot be denied a benefit for refusing to provide the number unless the number is required by federal law (or the disclosure is to an agency that had been using Social Security numbers prior to enactment of the Privacy Act). Although usually a consumer is not compelled to disclose her Social Security number to a private business, no federal law prohibits them from asking for it or from refusing to do business with a consumer who refuses to provide it.

20 {20} Fed. Trade Comm'n, Data Brokers: A Call for Transparency and Accountability, at i (May 2014) [11], *available at* www.ftc.gov.

21 {21} *Id.* at vii. The FTC noted these specific concerns: "Data brokers acquire a vast array of detailed and specific information about consumers; analyze it to make inferences about consumers, some of which may be considered sensitive; and share the information with clients in a range of industries. *All of this activity takes place behind the scenes, without consumers' knowledge." Id.* (emphasis added).

22 {22} The Act additionally imposes some restrictions on users of consumer reports and imposes obligations on those that furnish information to CRAs to provide accurate information. *See* Chs. 6 [12] and 7 [13], *supra*. Some state laws give consumers the right to deny access to, or to "freeze," their consumer reports. *See* § 9.4.1 [14], *supra*, and Appx. H [15], *infra*.

23 {23} *See* § 2.7.5 [16], *supra*.

24 {24} U.S. Gov't Accountability Office, GAO-06-674, Report to the Committee on Banking, Housing and Urban Affairs, U.S. Senate: Personal Information: Key Federal Privacy Laws Do Not Require Information Resellers to Safeguard All Sensitive Data (June 2006). *See generally* Ch. 2 [17], *supra* (discussing what constitutes a "consumer report" and "consumer reporting agency").

25 {25} *See* § 18.4.1 [18], *infra*.

26 {26} For example, through wiretapping. *See, e.g.*, 18 U.S.C. § 2510; Cal. Penal Code §§ 631 to 637; Conn. Gen. Stat. Ann. §§ 53a-187 to 53a-189; Haw. Rev. Stat. § 711-1111;

© Copyright, National Consumer Law Center, Inc., all rights reserved. Terms of Use.
National Consumer Law Center and NCLC are trademarks of National Consumer Law Center, Inc.

[EXHIBIT A]

27 {27} For example, the disclosure of customers' video recording rentals. *See, e.g.*, Cal. Civ. Code § 1799.3 (West); Conn. Gen. Stat. Ann. § 53-450; Iowa Code Ann. § 727.11.

28 {28} 15 U.S.C. §§ 6801 to 6810.

29 {29} *See* § 18.4.1 [18], *infra*.

**Source:** National Consumer Law Center, Fair Credit Reporting [9th ed.], updated at www.nclc.org/library
**Source URL:** https://library.nclc.org/fcr/1801-0

**Links**
[1] http://www.epic.org/privacy/internet/cookies
[2] https://www.acxiom.com/wp-content/uploads/2019/02/Acxiom_Data_Overview_2019_02.pdf
[3] https://www.experian.com/marketing-services/targeting/data-driven-marketing
[4] http://www.equifax.com/compiled-data/
[5] https://republicans-oversight.house.gov/wp-content/uploads/2018/12/Equifax-Report.pdf
[6] https://www.ftc.gov/news-events/press-releases/2014/12/ftc-charges-data-broker-facilitating-theft-millions-dollars
[7] http://www.nytimes.com/2013/09/29/us/nsa-examines-social-networks-of-us-citizens.html?_r=0
[8] http://aristotle.com/political-data
[9] https://library.nclc.org/nclc/link/CA.09.03.04
[10] https://library.nclc.org/nclc/link/FCR.05.04
[11] https://www.ftc.gov/system/files/documents/reports/data-brokers-call-transparency-accountability-report-federal-trade-commission-may-2014/140527databrokerreport.pdf?utm_source=govdelivery
[12] https://library.nclc.org/nclc/link/FCR.06
[13] https://library.nclc.org/nclc/link/FCR.07
[14] https://library.nclc.org/nclc/link/FCR.09.04.01
[15] https://library.nclc.org/nclc/link/FCR.AH
[16] https://library.nclc.org/nclc/link/FCR.02.07.05
[17] https://library.nclc.org/nclc/link/FCR.02
[18] https://library.nclc.org/nclc/link/FCR.18.04.01

[EXHIBIT A]

© Copyright, National Consumer Law Center, Inc., All rights reserved. Terms of Use
National Consumer Law Center and NCLC are trademarks of National Consumer Law Center, Inc.



S-SFMRSA11
PCA37600313300 - 826623270 I26600
*Return Address :*
MRS BPO, L.L.C.
1930 OLNEY AVE.
CHERRY HILL, NJ 08003

**REDACTED**

1930 OLNEY AVE.
CHERRY HILL, NJ 08003
833-306-0703

Office Hours:
Monday - Thursday   9am - 9pm ET
Friday                      9am - 5pm ET

REDAC

DAVID M LIEBMAN
Redacted
Redacted

June 11, 2020

CURRENT CREDITOR: Redacted
CURRENT CREDITOR ACCT#: xxxx^Redacted
ORIGINAL CREDITOR: Redacted
ORIGINAL CREDITOR ACCT#: xxxx^Redacted
MRS ACCT#: REDACTED
**ACCOUNT BALANCE :** Redacted

Would you prefer to chat about payment options
via the web? You can visit us at www.mrsbpo.com
and chat with a representative.

Dear DAVID M LIEBMAN,

We recognize that sometimes circumstances or events can make it difficult to satisfy your financial obligations. We are presenting three options to resolve your balance. We are not obligated to renew these offers.

Option 1: Make 1 payment of Redacted to be received by 06/26/2020.

Option 2: Make 6 payments of Redacted. The first payment of Redacted is to be received by 06/26/2020. Remaining payments of Redacted are to be received by the 26th of each following month until the total discount offer of Redacted is paid.

Option 3: Make 12 payments of Redacted. The first payment of Redacted is to be received by 06/26/2020. Remaining payments of Redacted are to be received by the 26th of each following month until the total discount offer of Redacted is paid.

Payment may be made by calling 833-306-0703, mailing to the above address, or by using our online payment website at https://portal.mrsbpo.com.

When you call, please let our representative know that you have received the Redacted Option Letter.

Sincerely,
MRS BPO, L.L.C.
833-306-0703
Letter ID: REDACTED

This is an attempt to collect a debt and any information obtained will be used for that purpose.
This communication is from a debt collector.

# [EXHIBIT B]



# Civil Case Information Statement

## Case Details: ESSEX | Civil Part Docket# L-004578-21

Case Caption: LIEBMAN DAVID  VS MRS BPO, L.L.C.

Case Initiation Date: 06/10/2021

Attorney Name: YONGMOON KIM

Firm Name: KIM LAW FIRM LLC

Address: 411 HACKENSACK AVE STE 701
HACKENSACK NJ 07601

Phone: 2012737117

Name of Party: PLAINTIFF : Liebman, David, M

Name of Defendant's Primary Insurance Company
(if known): Unknown

Case Type: COMPLEX COMMERCIAL

Document Type: NJ eCourts Case Initiation Confirmation

Jury Demand: YES - 6 JURORS

Is this a professional malpractice case?  NO

Related cases pending: YES

If yes, list docket numbers: Scibilia v. MRS BPO, L.L.C., ESX-L-3614-21

Do you anticipate adding any parties (arising out of same transaction or occurrence)? NO

Are sexual abuse claims alleged by: David M Liebman? NO

### THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE
CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

Do parties have a current, past, or recurrent relationship? NO

If yes, is that relationship:

Does the statute governing this case provide for payment of fees by the losing party? YES

Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition:


Do you or your client need any disability accommodations? NO
        If yes, please identify the requested accommodation:


Will an interpreter be needed? NO
        If yes, for what language:


Please check off each applicable category: Putative Class Action? YES  Title 59? NO  Consumer Fraud? YES


I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

06/10/2021                                                                          /s/ YONGMOON KIM
Dated                                                                                    Signed

ESSEX COUNTY - CIVIL DIVISION
SUPERIOR COURT OF NJ
465 MARTIN LUTHER KING JR BLVD
NEWARK          NJ 07102
                                    TRACK ASSIGNMENT NOTICE
COURT TELEPHONE NO. (973) 776-9300
COURT HOURS  8:30 AM - 4:30 PM

                    DATE:   JUNE 11, 2021
                    RE:     LIEBMAN DAVID  VS MRS BPO, L.L.C.
                    DOCKET: ESX L -004578 21

     THE ABOVE CASE HAS BEEN ASSIGNED TO:  TRACK 4.

     DISCOVERY IS PRESUMPTIVELY 450 DAYS BUT MAY BE ENLARGED OR SHORTENED BY THE
JUDGE AND RUNS FROM THE FIRST ANSWER OR 90 DAYS FROM SERVICE ON THE FIRST
DEFENDANT, WHICHEVER COMES FIRST.
FROM SERVICE ON THE FIRST DEFENDANT, WHICHEVER COMES FIRST.

     THE MANAGING JUDGE ASSIGNED IS:  HON KEITH E. LYNOTT

      IF YOU HAVE ANY QUESTIONS, CONTACT TEAM     002
AT:  (973) 776-9300 EXT 56908.

     IF YOU BELIEVE THAT THE TRACK IS INAPPROPRIATE YOU MUST FILE A
 CERTIFICATION OF GOOD CAUSE WITHIN 30 DAYS OF THE FILING OF YOUR PLEADING.
     PLAINTIFF MUST SERVE COPIES OF THIS FORM ON ALL OTHER PARTIES IN ACCORDANCE
WITH  R.4:5A-2.
                    ATTENTION:
                         ATT: YONGMOON KIM
                         KIM LAW FIRM LLC
                         411 HACKENSACK AVE STE 701
                         HACKENSACK     NJ 07601

ECOURTS

DAVID M. LIEBMAN, O/B/O HIMSELF & THOSE SIMILARLY SITUATED

Plaintiff

vs

MRS BPO, LLC,, ET AL

Defendant

20210615164251

Superior Court Of New Jersey

ESSEX Venue

Docket Number: ESX L 4578 21

**Person to be served** (Name and Address):
SECOND ROUND SUB, LLC,
PRINCETON SOUTH CORPORATE CENTER, STE 160  100 CHARLES EWING BLVD
EWING  NJ  08628
**By serving:** CORPORATION SERVICE COMPANY

**Attorney:** YONGMOON KIM, ESQ.

**Papers Served:** SUMMONS AND CLASS ACTION COMPLAINT, EXHIBITS

**AFFIDAVIT OF SERVICE**
(For Use by Private Service)

Cost of Service pursuant to R. 4:4-3(c)

$ _____.____

| **Service Data:** | [X] Served Successfully | [ ] Not Served |

Date/Time:   6/16/2021 1:11 PM   _____

[ ] Delivered a copy to him/her personally

[ ] Left a copy with a competent household member over 14 years of age residing therein (indicate name & relationship at right)

[X] Left a copy with a person authorized to accept service, e.g. managing agent, registered agent, etc. (indicate name & official title at right)

Name of Person Served and relationship/title:

JOHNNIE MYERS

PERSON AUTHORIZED TO ACCEPT SERVICE

**Description of Person Accepting Service:**

SEX:M___  AGE:21-35   HEIGHT: 5'9"-6'0"___   WEIGHT: 161-200 LBS.____   SKIN:BLACK_____   HAIR:BALD___   OTHER:_____

**Unserved:**
[ ] Defendant is unknown at the address furnished by the attorney
[ ] All reasonable inquiries suggest defendant moved to an undetermined address
[ ] No such street in municipality
[ ] Defendant is evading service
[ ] Appears vacant
[ ] No response on:      Date/Time: _____
                         Date/Time: _____
                         Date/Time: _____

Other:

**To Be Used Where Electronic Signature Not Available**
Served Data:
Subscribed and Sworn to me this

_____day of _____, 20 _____

Notary Signature:_____

_____   _____
     Name of Notary              Commission Expiration

**Docusign Court Approved E-Signature**

I, JANE NUNN,
was at the time of service a competent adult, over the age of 18 and not having direct interest in the litigation. I declare under penalty of perjury that the foregoing is true and correct.

*JANE NUNN*
_____
08FC67C22F8BE5D494
Signature of Process Server

06/16/2021
_____
Date

Name of Private Server: JANE NUNN  Address: 2009 Morris Avenue UNION, NJ 07083  Phone: (800) 672-1952